FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 FEB -6 AM 9:25

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

DAVID DWAYNE CASSADY,                )
                                     )
            Plaintiff,               )
                                     )
                                     )
        v.                           )        CV 109-128
                                     )
                                     )
VICTOR L. WALKER, Warden, et al.,    )
                                     )
            Defendants.              )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

At the time of the events giving rise to the above-captioned case brought pursuant to

42 U.S.C. § 1983, Plaintiff was an inmate incarcerated at Augusta State Medical Prison

("ASMP") in Grovetown, Georgia.[1]  The case is now before the Court on Defendants'

motion for summary judgment. (Doc. no. 35.) Plaintiff opposes the motion, and Defendants

have filed a reply brief and a "Notice of Supplemental Authority" in support of their motion.

(Doc. nos. 40, 42, 45.)  For the reasons set forth below, the Court **REPORTS** and

**RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED IN**

**PART** and **DENIED IN PART**.

---

[1]Plaintiff commenced this case *pro se*, but he is now represented by counsel.

## I.  FACTS

Plaintiff, who has been incarcerated in various Georgia Department of Corrections ("GDOC") facilities since 1993, transferred to ASMP on February 17, 2009, and remained incarcerated there until he transferred to a different facility on May 11, 2010. (Doc. no. 34, Ex. 1 (hereinafter "Walker Aff."), ¶ 5 & Attach. A (transfer history).) Defendant Walker was the Warden of ASMP at the time Plaintiff arrived, and he served in that position until October 1, 2009. (Id. ¶ 4.) During the time period relevant to this case, the remaining Defendants worked in the following positions at ASMP: Defendant Wilkes was the Deputy Warden of Care and Treatment, Defendant Evans was the Captain of Security, Defendant Garnett was a Licensed Practical Nurse ("LPN"), and Defendant Scott worked as a correctional officer with the rank of Lieutenant. (See id., Ex. 2 (hereinafter "Wilkes Aff."), ¶ 3; Ex. 3 (hereinafter "Scott Aff."), ¶ 3; Ex. 4 (hereinafter "Evans Aff."), ¶ 3; Ex. 5 (hereinafter "Garnett Aff."), ¶ 3.)

In his amended complaint,[2] Plaintiff asserts two sets of claims. First, he claims that Defendants Walker, Wilkes, and Evans acted with deliberate indifference to his health by exposing him to unreasonably high levels of environmental tobacco smoke ("ETS"). Second, he claims that Defendants Garnett and Scott acted with deliberate indifference to his

---

[2]Plaintiff filed his original complaint *pro se*, and Defendants responded with a motion for a more definite statement. (Doc. no. 6.) Because the Court found that the original complaint did not comply with Federal Rule of Civil Procedure 8(a), it granted Defendants' motion for a more definite statement and required that Plaintiff file an amended complaint. (Doc. no. 12.) Plaintiff filed his amended complaint though counsel in accordance with the Court's directive. (See doc. no. 13.)

serious medical needs by interfering with treatments prescribed for his respiratory conditions.

(Doc. no. 13, p. 6.)

### A. Facts Pertaining to ETS Claims Against Defendants Walker, Wilkes, and Evans

#### 1. Plaintiff's Respiratory Conditions and ETS Exposure at ASMP

In his original complaint, which was verified as an affidavit,[3] Plaintiff attests that he

---

[3]Plaintiff's original complaint is sworn and describes facts based upon personal knowledge. (See doc. no. 1, pp. 6, 62.) As the verified complaint meets the requirements of 28 U.S.C. § 1746 and Fed. R. Civ. P. 56(e), it is sufficient to create an issue of material fact in response to Defendants' motion. See U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1444 (11th Cir. 1991). Defendants, however, contend that the verified complaint, along with the exhibits attached thereto, should be excluded because Plaintiff later filed an amended complaint, which superseded the original complaint. (See doc. no. 42, pp. 2-3.) The Court agrees with Defendants that Plaintiff's amended complaint superseded his original complaint as the operative pleading in this case. See Lowery v. Ala. Power Co., 483 F.3d 1184, 1219 (11th Cir. 2007) ("Under . . . federal law, an amended complaint supersedes the initial complaint and becomes the operative pleading in the case."). However, the Court finds that Plaintiff is not precluded from relying on the verified original complaint and its accompanying exhibits in opposing Defendants' summary judgment motion. Aside from being superseded as the operative pleading, Defendants point to no evidentiary deficiency in the verified complaint or the exhibits, many of which consist of sworn written statements by inmates regarding their smoking practices at ASMP. (See doc. no. 1-3, pp. 10-29.) Moreover, while the original complaint was superseded as the operative pleading, and therefore does not control which claims are at issue in this action, "it is still a signed statement of facts equivalent to an affidavit with respect to factual matters within [P]laintiff's personal knowledge." Boxdorfer v. Thrivent Fin. for Lutherans, Case No. 1:09-cv-109, 2009 U.S. Dist. LEXIS 69636, at *5 & n.2 (S.D. Ind. Aug. 10, 2009) (considering original verified complaint "only for evidentiary purposes" despite superseding amended complaint). In addition, regarding the exhibits attached to the original complaint, it would defy common sense to rule that Plaintiff could rely on such exhibits by attaching them to his response to Defendant's summary judgment motion but not by referring to them as they already exist on the record. Accordingly, the Court declines Defendants' invitation to exclude from consideration Plaintiff's original complaint and its accompanying exhibits in ruling on the instant motion. See id.; see also Bechler v. Macaluso, Case No. CV 08-3059, 2010 U.S. Dist. LEXIS 48094, at *3-5 & n.1 (D. Or. May 14, 2010) (considering original verified complaint in ruling on summary judgment motion despite superseding amended complaint, in part because the court had ordered plaintiff to amend his original complaint); Lee v. Ritter, Case No. 1:02-CV-282, 2005 U.S. Dist. LEXIS 34988, at *9-10 (E.D. Tenn. Dec. 12,

had been diagnosed with Reactive Airway Disease ("RAD") prior to his transfer to ASMP.[4] (Doc. no. 1, p. 12.) Upon arrival at ASMP in February of 2010, Plaintiff was housed in a unit designated for "level three" mental health inmates. (Id. at 13; Walker Aff. ¶ 7.) Plaintiff was initially housed with a non-smoking cell mate for about a week, but then he was assigned a different cell mate, Justin Nichols, who smoked heavily in their shared living space. (Doc. no. 33-3 (hereinafter "Pl. Dep."), p. 65.) Plaintiff has submitted a sworn declaration from Nichols in which he attests that he smoked approximately 30 cigarettes per day and that he primarily smoked in the dorm rather than outside. (Doc. no. 1-3, p. 12.)

Plaintiff and Nichols shared a cell for approximately three months. (Pl. Dep., p. 64.) Plaintiff's third cell mate was a non-smoker who was moved out after a single weekend. (Id.) Next, another heavy smoker, David Wayne Little, was assigned as Plaintiff's cell mate, and he shared Plaintiff's cell for roughly a month. (Id.; doc. no. 1, p. 13.) Little attests that, during the time he was Plaintiff's roommate, he smoked 60 cigarettes per day on average. (Doc. no. 1-3, p. 13.) Little additionally states that he primarily smoked inside, especially after 8 p.m., due to the lack of smoke breaks. (Id.) Also, according to Plaintiff, 92 percent of the inmates in the level three mental health unit smoked, causing Plaintiff significant ETS exposure in his own cell and throughout the dorm. (Doc. no. 1, pp. 13-15.)

Plaintiff's medical records reveal that he was treated on several occasions for

---

2005) (considering both original verified complaint and unverified superseding amended complaint in ruling on summary judgment motion).

[4]The parties alternately employ the terms "Reactive Airway Disease" and "Reactive Airway Dysfunction Syndrome" when referring to Plaintiff's condition. For ease of reference, the Court will simply refer to Plaintiff's condition as RAD.

complaints regarding his respiratory condition during the first few months of his confinement at ASMP. Upon his arrival at ASMP, Plaintiff was prescribed various respiratory treatments, including Q-var, an Albuterol inhaler, and a nebulizer. (Doc. no. 34-1 (hereinafter "Nichols Aff."), ¶ 23 & Attach. B (prison medical records).) Prison medical personnel performed tests in mid-March of 2009, which revealed mild Chronic Obstructive Pulmonary Disease ("COPD") and "severe diffusion defect." (Id. ¶ 25 & Attach. B; doc. no. 1-3, p. 63.) Plaintiff was later referred to a pulmonologist, Dr. Amy Blanchard, who concluded that Plaintiff had moderate to severe persistent asthma, allergic rhinosinusitis, and "probable" obstructive sleep apnea. (Doc. no. 34-17, p. 15.) Dr. Blanchard prescribed additional treatments, and she included in her report an instruction for Plaintiff to "avoid smoke, chemicals." (Id.) Shortly after Plaintiff was seen by Dr. Blanchard, prison officials issued him a "medical profile" that stated, "detail restriction: no chemicals, fumes or dust." (Wilkes Aff. ¶ 36 & Attach. O.) Later tests performed at ASMP indicated that Plaintiff had moderate to severe COPD and hyperinflation. (Nichols Aff. ¶ 29; doc. no. 34-17, pp. 5-6.)

During the same time period, Plaintiff wrote numerous letters and grievances to prison officials at ASMP, including Defendants Walker, Wilkes, and Evans. (See doc. nos. 1-3, 1-4, 1-5.) In these letters and grievances, Plaintiff informed these Defendants of his various respiratory conditions and complained that he was being subjected to high levels of ETS in his living quarters despite the prison's policy against indoor smoking; he also indicated that his ETS exposure was negatively affecting his health and putting him at risk, and he sought to be provided with ETS-free housing. (See id.) In letters to Defendants Wilkes and Evans dated April 5 and April 9, 2009, Plaintiff explicitly noted Dr. Blanchard's

instruction that he not be exposed to smoke. (Doc. no. 1-4, pp. 10, 17, 19.)

Plaintiff's entreaties to Defendants Walker, Wilkes, and Evans met with no success. In response to his letters and grievances, Plaintiff was repeatedly told that the prison's policy prohibiting indoor smoking adequately addressed his concerns. (See doc. nos. 1-4, 1-5.) In June of 2009, Plaintiff was transferred out of the level three mental health dorm into a single-man cell in segregated confinement; Defendant Wilkes indicates that this move was prompted by Plaintiff's violation of a prison rule, while Plaintiff states that the transfer was part of an arrangement with prison officials to provide information regarding another inmate's illegal acquisition of a cell phone. (Wilkes Aff. ¶ 15 & Attach. B; doc. no. 1, pp. 34-37.) While Plaintiff did not have a cell mate in the segregation unit, he avers that he was nevertheless exposed to significant levels of ETS and that he suffered severe asthma attacks requiring medical treatment. (Doc. no. 1, pp. 36-37.) Plaintiff again asked prison officials to provide him with ETS-free housing. (Id.; doc. no. 1-4, p. 57.)

On or around June 24, 2009, Plaintiff attempted suicide by soaking a rag with liquid Albuterol and forcing it into his mouth. (Doc. no.1, pp. 38-39; Nichols Aff. ¶ 33.) As a result, he was admitted to ASMP's "Crisis Stabilization Unit," following which he was confined in the "Acute Care Unit" for several days. (Nichols Aff. ¶ 33; Wilkes Aff. ¶¶ 22-23 & Attach. B.) Thereafter, on or around July 7, 2009, Plaintiff was transferred to the unit designated for level four mental health inmates, where he remained until his transfer to a different facility on May 11, 2010. (Wilkes Aff. ¶ 17 & Attach. B.) While in the level four mental health unit, Plaintiff was confined in a single-man cell with windows that he could open from the inside. (Id.) However, Plaintiff maintains that he was nevertheless subjected

6

to high levels of ETS in the level four mental health unit. (See Pl. Aff. ¶ 7; doc. no. 34-21, p. 1.) Also, Defendants have submitted testimony that Defendant Wilkes provided in a separate ETS case in which he stated that level four mental health inmates, who characteristically suffer from severe disorders, are especially non-compliant with prison rules, including the rules against smoking indoors.[5] (Doc. no. 34-23, p. 15.) Defendant Wilkes further acknowledged that he and other prison officials conferred about Plaintiff's housing assignment following the issuance of the preliminary injunction in Plaintiff's other ETS case requiring that Plaintiff be provided smoke-free accommodations; Defendant

---

[5]Defendant Wilkes provided this testimony in a hearing in a separate ETS case brought by Plaintiff that is currently pending in the Savannah Division of the Southern District of Georgia. See Cassady v. Donald, CV 408-250, doc. no. 105 (S.D. Ga. Nov. 3, 2010) (hereinafter "CV 408-250"). Plaintiff commenced his other case prior to his incarceration at ASMP, and it primarily concerns his previous place of incarceration, Coastal State Prison ("Coastal"). See id., doc. no. 1. In that case, Plaintiff moved for, and was granted, a preliminary injunction by the Honorable William T. Moore, Jr., United States District Judge, pursuant to a recommendation by the Honorable G.R. Smith, United States Magistrate Judge. Id., doc. nos. 27, 37, 40. The injunction required defendant Brian Owens, the Commissioner of the GDOC, to provide Plaintiff with smoke-free accommodations. Id., doc. nos. 37, 40. The injunction explicitly applied to Plaintiff's confinement at ASMP, despite the fact that his underlying claims concerned Coastal. See id.

Plaintiff later alleged that he had not been provided smoke-free accommodations, and Judge Smith held a hearing on October 21, 2010, to determine whether Plaintiff's confinement at ASMP violated the injunction. See id., doc. no. 105. The court ultimately determined that Plaintiff's confinement at ASMP during the period in question – which coincides with the relevant time period in this case – did not comply with the preliminary injunction, although the expiration of the injunction precluded civil contempt sanctions. See id., doc. nos. 106, 113. Additionally, Judge Moore denied the parties' cross motions for summary judgment, and the Eleventh Circuit affirmed the denial of the defendants' motion for summary judgment on interlocutory appeal. See id., doc. no. 112; Cassady v. Donald, No. 11-11800, 2011 U.S. App. LEXIS 21734 (11th Cir. Oct. 25, 2011) (per curiam).

Both parties in the instant case rely upon testimony offered in the October 21, 2010 hearing in CV 408-250. (See doc. nos. 34-19, 35, 40.) The Court will therefore consider such testimony to the extent that it relates to the issues in this case, which are not the same as the issue for which the testimony was offered – i.e., compliance with the preliminary injunction in CV 408-250.

Wilkes testified that he and the other prison officials decided to keep Plaintiff confined in the same unit despite knowing that the inmates in that unit were particularly non-compliant with the smoking policy. (See id.)

It is undisputed that Plaintiff regularly purchased tobacco products from the inmate store throughout his incarceration ASMP. (See Pl. Dep., p. 54.) However, Plaintiff testified that he "never consumed any tobacco products." (Id. at 53.) Plaintiff explained that he would give tobacco products to other inmates in exchange for their protection, which he felt was necessary in light of a past incident in which he was stabbed and raped by another inmate.[6] (Id. at 54.) Plaintiff further explained that prison officials limit the number of stamps and legal supplies that a single inmate can purchase at the store; as a result, prior to obtaining counsel, he would often trade tobacco products for such materials. (Id. at 54-55.) Also, Plaintiff stated that he occasionally purchased tobacco products out of pity for inmates who did not have any resources. (Id. at 56.)

### 2.    ASMP's Smoking Policy

The Georgia Department of Corrections Standard Operating Procedure ("SOP") in effect at the time Plaintiff was incarcerated at ASMP provided that "the use of tobacco products by inmates shall be prohibited inside any building, office or state vehicle." (Walker Aff. ¶ 8 & Attach. 8 (copy of SOP VH35-0002, § VI.B).) While the parties do not dispute the existence of this smoking policy, they disagree about the implementation and

---

[6]One of the inmates to whom Plaintiff gave tobacco products in exchange for protection was Robert Brown, who verified Plaintiff's account of their arrangement. (See doc. no. 34-19, pp. 8-13.) Plaintiff and Brown specified that they arranged for Brown to provide protection without smoking in close proximity to Plaintiff. (See id.; Pl. Dep., pp. 67-68.)

enforcement of the policy.

According to Defendant Wilkes, during the time period in question, inmates were only permitted to smoke in designated areas outside. (Wilkes Aff. ¶ 7.) Defendant Wilkes further attests that lighters were installed in the designated outdoor smoking areas and that smoke breaks "were allowed in unrestricted areas from 9 a.m. - 10:30 a.m.; noon - 2 p.m.; 2:30 p.m. - 4:15 p.m.; and 4:45 p.m. until dark." (Id. ¶ 9.) Plaintiff, however, testified in his deposition that prison officials "didn't start giving smoke breaks at ASMP until [he] filed the injunction. Then they started giving smoke breaks."[7] (Pl. Dep., p. 5.) In addition, Plaintiff has submitted affidavits by several inmates from the time period in question, including his former cell mates, stating either that prison officials at ASMP did not allow smoke breaks or that they allowed very few smoke breaks, which resulted in excessive smoking indoors. (Doc. no. 1-3, pp. 12-29.)

The evidence regarding prison officials' efforts to enforce the smoking policy is similarly conflicted. Defendants have provided data that ASMP officials issued 294 disciplinary reports for smoking policy violations between February of 2009 and May of 2010. (Doc. no. 34, Ex. 6, ¶ 6.) Defendant Walker avers that he or one of the deputy wardens "conducted daily morning inspections of every dormitory to ensure [his] staff's compliance with . . . the no-smoking policy." (Walker Aff. ¶ 9.) Defendant Walker further indicated that if he became aware of an inmate smoking in the dormitory, he would discipline the inmate according to prison policy, which included instructing prison staff "to offer

---

[7]Plaintiff's reference to "the injunction" in his deposition testimony appears to refer to the preliminary junction he was awarded in his other ETS case. See supra note 4.

9

alternative sanctions [including verbal warnings or extra work duties] instead of issuing a disciplinary report when the staff member believed that informally correcting the inmate's unauthorized actions was not the most appropriate method." (Id. at 10-11.) As an example of his enforcement of the smoking policy, Defendant Walker states that when he discovered the practice of removing electrical sockets to light cigarettes, he discouraged such activity by refusing to repair the sockets after they became inoperable. (Id. at 13.) Defendants Wilkes and Evans provide similar testimony, indicating that they were vigilant in disciplining inmates who smoked indoors with verbal warnings, additional work assignments, yard restrictions, store restrictions, and disciplinary reports. (Wilkes Aff. ¶¶ 10-13; Evans Aff. ¶¶ 9-10, 12.)

Plaintiff, on the other hand, attests that neither Defendant Walker nor the deputy wardens, including Defendant Wilkes, performed daily inspections. (Doc. no. 40-3 (hereinafter "Pl. Aff."), ¶¶ 3-4, 12.) Plaintiff further states that he reported violations of ASMP's smoking policy to Defendants Walker, Wilkes, and Evans, none of whom took any action in response as far as he knew. (Id. ¶¶ 5, 7, 10-11, 13, 20.) In addition, in many of the sworn declarations from ASMP inmates provided by Plaintiff, the inmates report that they were undeterred from smoking in the dorm and did so with relative impunity, sometimes being issued a disciplinary report but often merely being told to put out their cigarette when caught. (See doc. no. 1-3, pp. 12-29.) Inmate Brown, who provided Plaintiff with protection in exchange for tobacco products, testified that on various occasions, prison officials would catch him smoking indoors and tell him to put out his cigarette, but he would continue smoking because the officials would walk away without actually making him put out the

10

cigarette. (Doc. no. 34-19, p. 12.) Another inmate avers that prison officials at ASMP would sometimes violate the policy themselves by smoking indoors. (Doc. no. 1-3, p. 26.)

### B. Facts Pertaining to Claims for Interference with Prescribed Treatment Against Defendants Garnett and Scott

Plaintiff avers that while confined in the Acute Care Unit following his suicide attempt, he was denied his breathing treatments and was only allowed access to his inhaler twice instead of four times daily.[8] (Doc. no. 1, pp. 41-43.) Plaintiff states that on July 1, 2009, he complained about this issue to Defendant Garnett, who did not allow Plaintiff to self-administer his inhaler but agreed to provide access to the inhaler as needed and to speak with a supervisory officer about the breathing treatments. (Id.) Defendant Garnett does not recall this incident. (Garnett Aff. ¶ 8.) However, he attests that as an LPN, his responsibilities were limited to "dispensing medication to the inmates . . . in accordance with the orders or prescriptions provided by the upper-level medical providers." (Id. at 4.)

Plaintiff further asserts that on July 3, 2009, he raised the issue of his breathing treatments to an official in the unit, Officer McNeil, who contacted a member of the medical staff and, pursuant to her directive, documented in the unit log book that Plaintiff was to be escorted to the prison hospital twice daily to receive his breathing treatments. (Doc. no. 1, p. 43.) Plaintiff states that later that day, a different unit official, Officer Mays, asked Defendant Scott, the shift supervisor, for an escort to take Plaintiff to the medical unit to

---

[8]Defendants have provided evidence that Plaintiff was not allowed to self-administer his inhaler in the Acute Care Unit and that the machine used to administer Plaintiff's breathing treatments was taken away from Plaintiff because he had tampered with it. (Wilkes Aff. ¶ 24.) While Plaintiff disputes the assertion that he tampered with the machine, he does not dispute that it was taken away due to tampering. (See doc. no. 40-1, ¶ 47.)

receive his breathing treatment. (Id.) Plaintiff claims that he explained to Defendant Scott that he needed the breathing treatment for his asthma, but Defendant Scott refused to provide an escort for Plaintiff to go to the medical unit to receive his breathing treatment. (Id.) According to Plaintiff, on July 4, 2009, he suffered a "serious asthma attack" and was taken to the medical unit to receive treatment. (Id.; Pl. Aff. ¶ 24.)

While Defendant Scott acknowledges that he supervised the officers in the Acute Care Unit, he also does not recall any incident involving Plaintiff's treatment while he was housed in that unit. (Scott Aff. ¶¶ 7, 9.) Defendant Scott indicates that he was not working during the shift in question, as he stated in response to Plaintiff's grievance regarding the incident. (Id. ¶ 11.) Defendants have produced records indicating that Plaintiff refused his Albuterol prescription from June 28, 2009, through July 3, 2009. (Nichols Aff. ¶ 34 & Attach. B.) Plaintiff, however, maintains that he never refused any prescribed treatments, and he asserts that prison officials neglected to provide the treatments and covered their misconduct by writing in the log book that the treatments had been refused. (Pl. Aff. ¶ 23.)

Regarding Plaintiff's July 4, 2009 asthma attack, Dr. Nichols, ASMP's Medical Director, confirms that Plaintiff reported to the medical unit with breathing problems. (Nichols Aff. ¶ 35.) Based on the treatment notes for the visit, Dr. Nichols states that Plaintiff "was in no apparent distress" during the visit and that "[t]he exam findings were significant for a regular heart rate and diffuse wheezes of the lung." (Id. ¶ 35 & Attach. B.) Dr. Nichols further indicates that Plaintiff "was given an Albuterol and Atrovent jet nebulizer treatment," and he reports that Plaintiff left the medical unit feeling better. (Id.)

12

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Applicable substantive law identifies which facts are material in a given case.[9] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is

---

[9]For purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

viewed in the light most favorable to the non-moving party. <u>Adickes</u>, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Clark</u>, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255 (quoting <u>Adickes</u>, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.

### B. Merits of Plaintiff's Claims

As noted previously, Plaintiff's claims in this case fall into two categories: his ETS claims against Defendants Walker, Wilkes, and Evans, and his claims against Defendants Garnett and Scott for interfering with his prescribed treatments. The Court addresses these sets of claims separately below, concluding that Defendants' summary judgment motion should be denied as to the ETS claims and granted as to the interference with treatment claims.

### 1. Defendants Walker, Wilkes, and Evans Are Not Entitled to Summary Judgment as to Plaintiff's ETS Claims

Defendants contend that Plaintiff's ETS claims against Defendants Walker, Wilkes, and Evans should fail because Plaintiff did not have a physician-ordered profile for a smoke-free environment and because they did not disregard any risk to Plaintiff's present or future

14

health. (See doc. no. 35-1, pp. 7-24.) Defendants maintain that they adequately enforced the smoking policy, and they argue that Defendants Walker, Wilkes, and Evans are not vicariously liable for the conduct of inmates who smoked in violation of that policy. (See id. at 14-26.) In addition, Defendants Walker, Wilkes, and Evans claim entitlement to qualified immunity. (Id. at 31-37.)

Plaintiff counters that his medical records showed that he suffered various respiratory conditions and needed to avoid smoke, which he repeatedly communicated to Defendants Walker, Wilkes, and Evans. He also contends that ASMP's smoking policy lacked adequate enforcement and that Defendants have not shown entitlement to qualified immunity. (See doc. no. 40.) The Court agrees with Plaintiff and therefore concludes that Defendants Walker, Wilkes, and Evans should not be granted summary judgment.

The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement. Accordingly, a prisoner can recover under § 1983 for a violation of the Eighth Amendment if he can show "that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005) (quoting Helling v. McKinney, 509 U.S. 25, 35-36 (1993)) (punctuation omitted). To prevail on such a claim, the prisoner must satisfy two elements, one objective and one subjective. Id.

"As for the objective factor, the prisoner must show that he himself is being exposed to unreasonably high levels of ETS." Id. In determining whether the prisoner has satisfied the objective element, the Court must inquire whether "the risk to his health is so grave as to violate contemporary standards of decency." Giddens v. Calhoun State Prison, 277 F.

App'x 847, 847-48 (11th Cir. 2007) (*per curiam*). Factors relevant to this determination include "the seriousness of the potential harm" and the likelihood that the prisoner will actually suffer an injury to his health as a result of his ETS exposure. Kelley, 400 F.3d at 1284 (quoting Helling, 509 U.S. at 36.)

"As for the subjective factor, the prisoner must show that prison authorities demonstrated a 'deliberate indifference' to his plight." Id. Deliberate indifference requires proof of "three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Cassady, 2011 U.S. App. LEXIS 21734, at *3 (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004)); Giddens, 277 F. App'x at 848.

The adoption of a smoking policy is relevant to both elements of an ETS claim. See Kelley, 400 F.3d at 1284. Moreover, a prisoner who shows nothing more than negligent enforcement of such a policy falls short of establishing an Eighth Amendment violation. Id. at 1285. However, "the mere existence of such a policy will not, by itself, satisfy the requirements of the Eighth Amendment; there must be a good faith effort to enforce the policy and the absence of such an effort may result in a finding of deliberate indifference." Bartlett v. Pearson, 406 F. Supp. 2d 626, 632 (E.D. Va. 2005); see also Talal v. White, 403 F.3d 423, 428 (6th Cir. 2005) ("[T]he mere existence of non-smoking pods does not insulate a penal institution from Eighth Amendment liability . . . .").

Here, Plaintiff has shown a genuine dispute of material fact as to both essential elements of his ETS claims. Regarding the objective factor, the relevant medical evidence shows that Plaintiff is particularly susceptible to ETS exposure in that he suffers from

16

respiratory conditions that became progressively more severe during his confinement at ASMP, including RAD, moderate to severe asthma, moderate to severe COPD, and allergic rhinosinusitis. (Doc. no. 1, p. 12; Nichols Aff. ¶¶ 23, 25, 29; doc. no. 34-17, pp. 5-6, 15.) These conditions required a daily regimen of various treatments, and Dr. Blanchard, the pulmonologist who treated Plaintiff during the relevant time period, specified in Plaintiff's medical records that he needed to avoid smoke.[10] (See id.) Moreover, Plaintiff presented evidence that he was exposed to significant levels of ETS in each of the units where he was housed at ASMP. Plaintiff's ETS exposure was particularly high in the level three mental health unit, where 92 percent of the inmates smoked, often indoors, and where Plaintiff spent several months sharing a cell with inmates who smoked between 30 and 60 cigarettes per day. (Doc. no. 1, pp. 13-15; doc. no. 1-3, pp. 12-13; Pl. Dep., p. 64.)

Defendants' attempts to minimize this evidence are unavailing. For example, Defendants emphasize that Plaintiff's condition never required hospitalization at an outside facility. (Doc. no. 35-1, pp. 4, 13.) Given that ASMP is a medical prison designed to house inmates with serious medical problems and that Plaintiff's condition was evidently serious enough to refer him to a pulmonologist, the fact that Plaintiff was not sent to an outside hospital is unremarkable. (See Pl. Dep., p. 64; doc. no. 34-17, p. 15.) Defendants also point to Plaintiff's purported refusal of his prescribed medications. (Doc. no. 35-1, p. 13.) However, as noted above, Plaintiff contends that he never refused prescribed medication and

---

[10]In Plaintiff's other ETS case, Judge Moore and the Eleventh Circuit found that Plaintiff's asthma and RAD rendered him especially susceptible to ETS exposure. See CV 408-250, doc. no. 112, p. 9; Cassady, 2011 U.S. App. LEXIS 21734, at *6-7. Notably, these findings predate Plaintiff's later, more serious diagnoses, including his moderate to severe COPD.

that prison officials' documentation of such refusals was an effort to cover up their failure to dispense his medications. (Pl. Aff. ¶ 23.)

Defendants additionally rely on Dr. Nichols' affidavit testimony that his "review of [Plaintiff's] medical records does not support . . . a finding" that Plaintiff's ETS exposure at ASMP "has caused him to have asthma [and other future health problems related to breathing]." (Nichols Aff. ¶¶ 5-6 (brackets included in original quotation).) However, Plaintiff does not contend that his ETS exposure at ASMP caused him to develop asthma; indeed, he avers that he had already developed RAD prior to his arrival at ASMP. (Doc. no. 1, p. 12.) Moreover, Dr. Nichols' statement that Plaintiff's ETS exposure "has [not] caused him to have . . . future health problems," aside from being grammatically and temporally perplexing, is in tension with his concomitant testimony that "[s]econdhand smoke can . . . trigger asthma episodes," as well as Dr. Blanchard's directive for Plaintiff to "avoid smoke" in light of his respiratory conditions. (See Nichols Aff. ¶¶ 5-7; doc. no. 34-17, p. 15.)

Similarly off-base is Defendants' assertion that "[s]ince there is no evidence that [Plaintiff] suffered harm as a result of ETS exposure, he states no claim." (Doc. no. 35-1, p. 14.) This assertion misconstrues the objective element of Plaintiff's ETS claim: he need not prove that his ETS exposure has already caused him serious harm, but rather that his ETS exposure "pose[d] an unreasonable risk of serious damage to his future health." Kelley, 400 F.3d at 1284 (quoting Helling, 509 U.S. at 35); see also Helling, 509 U.S. at 32-35 (rejecting argument that "only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment").

In short, Defendant's arguments regarding the objective element are without merit,

18

and Plaintiff has shown a genuine dispute of material fact as to whether, in light of his respiratory conditions, he was exposed to levels of ETS that were unreasonably high and violated contemporary standards of decency.

Turning to the subjective element of Plaintiff's ETS claim, the Court finds that Plaintiff has shown a considerable quantum of evidence that Defendants Walker, Wilkes, and Evans were deliberately indifferent to his plight. As noted with regard to the objective prong, Plaintiff's medical records were rife with information regarding his respiratory conditions. Plaintiff repeatedly notified Defendants Walker, Wilkes, and Evans these matters in a series of letters and grievances. (See doc. nos. 1-3, 1-4, 1-5.) Moreover, in those communications, Plaintiff specifically noted the instruction from Dr. Blanchard that he avoid smoke because of his respiratory conditions. (See doc. no. 1-4, pp. 10, 17, 19.) In addition, Judge Moore issued a preliminary injunction requiring Plaintiff to be provided with smoke-free accommodations that explicitly applied to the prison officials at ASMP, including Defendant Wilkes, who acknowledged that he had discussed the injunction with other ASMP prison officials in determining where to house Plaintiff. See CV 408-250, doc. nos. 37, 40, 105. In light of this evidence, the Court rejects the contention that Plaintiff has not shown that Defendants Walker, Wilkes, and Evans were aware of the risk that ETS exposure posed to Plaintiff.

Equally unpersuasive is Defendants' contention that because Plaintiff "did not have a physician-ordered profile for a smoke-free environment," his ETS-based "claims of deliberate indifference fail." (Doc. no. 35-1, p. 7.) The existence of an ETS-related medical profile is not a *sina qua non* for Plaintiff's claim; rather, at most, it is simply one vehicle that

may show prison officials' awareness of an ETS-related risk. Plaintiff has shown that he notified Defendants Walker, Wilkes, and Evans in writing of his medical conditions and the attendant risk of ETS exposure – including the instruction from Dr. Blanchard to avoid smoke. It is also apparent that these Defendants were aware of the injunction in Plaintiff's other ETS case, which put them on notice that he should not be exposed to ETS. In light of these facts, it is immaterial whether Plaintiff had an ETS-related medical profile.

Furthermore, contrary to Defendants' contentions, the evidence related to ASMP's smoking policy is highly conflicted and does not warrant summary judgment on Plaintiff's ETS claims. Defendants Walker, Wilkes, and Evans each attest they actively sought out and punished inmates who smoked indoors and that inmates were provided numerous daily smoke breaks. (See Walker Aff. ¶¶ 8-14; Wilkes Aff. ¶¶ 7-13; Evans Aff. ¶¶ 6-13.) In stark contrast, Plaintiff has submitted evidence that smoke breaks were rarely provided and that inmates, including his own cell mates, continually smoked indoors without facing serious consequences. (See doc. no. 1-3, pp. 12-29.) For example, Inmate Brown testified that he would sometimes continue smoking undeterred when prison officials caught him smoking indoors because they would simply tell him to put out his cigarette and go about their business without ensuring that he did as told. (Doc. no. 34-19, p. 12.) Another inmate avers that prison officials at ASMP smoked indoors. (Doc. no. 1-3, p. 26.) Plaintiff also states that, contrary to Defendants' affidavit testimony, there were no daily inspections, and prison officials failed to take action when Plaintiff reported an incident of indoor smoking. (Pl. Aff. ¶¶ 3-5, 7, 10-13, 20.)

In addition, portions of Defendants' evidence offer support for Plaintiff's position.

20

Defendants tout the fact that they issued 294 disciplinary reports during the time Plaintiff was confined at ASMP. They also indicate that they frequently used informal reprimands to punish violators, which suggests that the 294 disciplinary reports represent only a fraction of the instances of inmates violating the smoking policy. (See doc. no. 35-1, p. 4.) This evidence suggests that violations of the smoking policy at ASMP were, at best, common. Defendant Wilkes confirms this state of affairs with respect to the inmates in the level four mental health unit, indicating that they were particularly prone to violating the smoking policy. (Doc. no. 34-23, p. 15.) Yet, despite an admitted awareness of this state of affairs, Defendant Wilkes testified that he and the other officials charged with Plaintiff's care housed him in a unit full of inmates known to violate the smoking policy. (See id.)

Defendants again miss the mark with their assertion that Defendants Walker, Wilkes, and Evans are not vicariously liable for the conduct of inmates who smoked in violation of that policy. (See doc. no. 35-1, pp. 24-26.) In support of this specious assertion, Defendants cite various cases that recite the well-established principle that recovery in § 1983 actions may not be based on a theory of respondeat superior – *i.e.*, that officials may not be held vicariously liable based solely on their supervision of lower level officers responsible for unlawful conduct. (See id. (citing, among other authorities, Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).) Defendants proceed to misapply this proposition by asserting that Defendants Walker, Wilkes, and Evans cannot be held vicariously liable for the conduct of inmates who smoked in violation of ASMP's prison policy. (See id.)

If Defendants' proposed application of the vicarious liability principle were correct, prison officials would only violate the Eighth Amendment if they were the ones using the

21

tobacco products that resulted in unreasonable ETS exposure. In other words, Defendants' view of the vicarious liability principle is inconsistent with the governing case law, which plainly recognizes that prison officials may be liable for ETS exposure caused by inmates smoking in the facilities for which the officials are responsible. See, e.g., Kelley, 400 F.3d at1283-85. Moreover, this is not a case in which Plaintiff contends that his warden should be held liable for the acts of lower-level prison officials. Rather, he claims that Defendants Walker, Wilkes, and Evans are liable to him for their own conduct in that they disregarded the risk to his health caused by his ETS exposure by failing to exercise their authority to prevent or remedy such exposure.[11] Accordingly, the Court finds Defendants' vicarious liability argument to be completely bereft of merit.

Nor is the Court persuaded by Defendants' continual emphasis of the fact that Plaintiff purchased tobacco products during his confinement at ASMP. There is no evidence that Plaintiff personally used tobacco products, and Plaintiff has plausibly explained that his primary use for the tobacco products was as payment to other inmates in exchange for their protection. (See Pl. Dep., p. 53-54.) As noted by the Eleventh Circuit in rejecting the identical argument asserted on appeal in CV 408-250, the fact that Plaintiff purchased cigarettes for other inmates "does not alter the fact that [Plaintiff] was exposed to high levels of second-hand, indoor smoke while incarcerated and unable to leave the prison nor the fact that Prison Officials were aware that inmates smoked indoors and did not always punish inmates for doing so." Cassady, 2011 U.S. App. LEXIS 21734, at *9-10 n. 2.

---

[11]Notably, Defendants do not contend that Defendants Walker, Wilkes, and Evans lacked authority to make changes in Plaintiff's housing assignment. (See doc. no. 35-1.)

In sum, Plaintiff has provided evidence that Defendants Walker, Wilkes, and Evans were aware of the serious risk posed by Plaintiff's exposure to ETS and disregarded that risk by conduct that exceeded mere negligence. Accordingly, Plaintiff has shown a genuine dispute of material fact as to these Defendants' deliberate indifference, thereby satisfying the subjective element of his ETS claims for purposes of summary judgment.

Furthermore, the Court rejects the assertion that Defendants Walker, Wilkes, and Evans are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Townsend v. Jefferson County, 601 F.3d 1152, 1157 (11th Cir. 2010). The defendant must show that he was acting within his discretionary authority; if he does, then "the plaintiff must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Townsend, 601 F.3d at 1158 (punctuation omitted) (quoting Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)). "A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent, and if a constitutional rule applies with obvious clarity to give an official fair warning that violating that right is actionable." Bennett v. Hendrix, 423 F.3d 1247, 1255 (11th Cir. 2005) (internal citations omitted).

Here, there is no dispute that Defendants were acting within their discretionary authority. However, for the reasons previously discussed, Plaintiff has shown a violation of a constitutional right by satisfying both elements of his ETS claims against Defendants

23

Walker, Wilkes, and Evans.[12]  Moreover, as noted by the Eleventh Circuit in rejecting the

assertion of qualified immunity in CV 408-250,

> Both the Supreme Court and this Court have held that a prisoner can state a
> cause of action under the Eighth Amendment for exposure to second-hand
> smoke by "alleging that prison officials have, with deliberate indifference,
> exposed him to levels of ETS that pose an unreasonable risk of serious
> damage to his future health." Moreover, . . . the Supreme Court has "directly
> addressed" and "provided clear guidance" on Eighth Amendment claims
> based on exposure to second-hand smoke.

Cassady, 2011 U.S. App. LEXIS 21734, at *7-8 (quoting Kelley, 400 F.3d at 1284, and

Helling, 509 U.S. at 35) (citation omitted).  In light of the Eleventh Circuit and Supreme

Court case law delineating the nature of the Eighth Amendment right at issue in Plaintiff's

ETS claims, the Court rejects Defendants' assertion that they did not violate clearly

established law.  (See doc. no. 35-1, pp. 36-38.)

>    **2.    Defendants Garnett and Scott Are Entitled to Summary
>            Judgment as to Plaintiff's Claims of Deliberate Indifference to
>            His Serious Medical Needs**

The Court next turns its attention to Plaintiff's second set of claims, in which he

asserts that Defendants Garnett and Scott exhibited deliberate indifference to his serious

medical needs by interfering with his prescribed treatments such that he did not receive

certain of his treatments between July 1 and July 4, 2009.  Defendants argue that Plaintiff's

claim against Defendant Garnett must fail because Plaintiff seeks to hold him liable for

matters that exceeded the scope of his responsibility as an LPN.  (Id. at 29-30.)  Defendants

---

[12]Of course, the Court's finding that Plaintiff has shown a violation of a constitutional
right for qualified immunity purposes is limited to the present summary judgment stage of
these proceedings, in which the facts are viewed in the light most favorable to Plaintiff.  This
finding should not be construed as any ruling or commentary on whether Plaintiff will
ultimately prevail on his ETS claims.

24

also assert that Plaintiff has failed to show that Defendant Scott was aware of Plaintiff's need for breathing treatments, and they further contend that Plaintiff cannot show the requisite harm. (Id. at 28-30.) Plaintiff does not address these contentions in his response to Defendants' motion for summary judgment, although he disputes certain of Defendants' factual contentions in his response to Defendants' statement of undisputed facts, such as his purported refusal of treatments during the time period in question. (See doc. no. 40-1, ¶ 107.)

To prevail on a claim of deliberate indifference to serious medical needs, Plaintiff must show: (1) that he had an objectively serious medical need, (2) that Defendants acted with deliberate indifference to that need, and (3) that his injury was caused by Defendants' wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007); see also Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010) (noting that a plaintiff must "show a causal connection between the constitutional violation and his injuries" to prevail on any § 1983 claim).

To satisfy the requirement of showing an objectively serious medical need, a prisoner must show that his medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994)). To show that Defendants were deliberately indifferent to his medical needs, Plaintiff must offer proof that Defendants: (1) were subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendants disregarded that risk by (3) following a course of action which constituted "more than mere negligence." Id.

In addition, as a prisoner plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill, 40 F.3d at 1188 (11th Cir.1994), *abrogated in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003) ("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what constitutes a serious medical need of prisoners."). Whether such delay amounts to deliberate indifference to a serious medical need depends on the length of the delay as well as "the nature of the medical need and the reason for the delay." Farrow, 320 F.3d at 1247.

Furthermore, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." West, 320 F.3d at 1243 (internal quotation and citation omitted). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991) (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability); Harris, 941 F.2d at 1505.

Here, Plaintiff asserts that because of the conduct of Defendants Garnett and Scott, he was denied his breathing treatments and was only allowed access to his inhaler twice daily, instead of four times, from July 1 through 4, 2009. (Doc. no. 1, pp. 41-43.) Because Plaintiff's full regimen of treatments was restored after his asthma attack on July 4, it is apparent that he seeks to recover based on the delay in his treatment purportedly caused by these Defendants' actions. Therefore, as noted previously, he must place verifying medical evidence in the record to establish the detrimental effect of the delay in his treatment. Hill, 40 F.3d at 1188.

Plaintiff has failed to meet this requirement. Plaintiff has not identified any medical evidence in the record concerning an injury related to these claims, and his only allegation of injury resulting from the delay in his treatments is the asthma attack he suffered on July 4, 2009. Moreover, Plaintiff's only evidence regarding the severity his injury is his own description of the asthma attack, in which he describes it as "serious" and "severe." (Doc. no. 1, p. 43; Pl. Aff. ¶ 24.) However, the medical evidence produced by Defendants, which include the treatment notes documenting the incident and Dr. Nichols' testimony, fails to disclose any serious injury; to the contrary, such evidence indicates that Plaintiff "was in no apparent distress" during the visit and left the medical unit feeling better after receiving breathing treatments. (Nichols Aff. ¶ 35 & Attach. B.)

Furthermore, while Plaintiff's respiratory conditions constitute a serious medical need, Plaintiff has failed to show deliberate indifference on the part of Defendants Garnett and Scott. It is undisputed that neither of these Defendants was responsible for prescribing Plaintiff's medical treatment. (Garnett Aff. ¶¶ 4-6; Scott Aff. ¶ 4.) Moreover, Defendant Scott's alleged failure to locate Plaintiff's prescription in the unit log book is at most negligence (see doc. no. 40-1, ¶ 56), and Plaintiff agrees that Defendant Garnett attempted to accommodate him by providing access to his inhalers as requested throughout the day and speaking to his supervisor about the breathing treatments (see doc. no. 1, pp. 41-43). The fact that Plaintiff was not satisfied with this course of action does not give rise to an Eighth Amendment violation. See Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir.1989) (noting that a difference in opinion as to a course of treatment does not rise to the level of constitutional violation).

In sum, Plaintiff has failed to show deliberate indifference on the part of Defendants Garnett and Scott. Therefore, there are no genuine issues of material fact to be decided at a trial regarding Plaintiff's claims against Defendants Garnett and Scott, and Defendants' motion for summary judgment should be granted with respect to these claims.

## III.    CONCLUSION

In sum, the Court **REPORTS AND RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**. (Doc. no. 35.) In particular, their motion should be granted as to Plaintiff's claims against Defendants Garnett and Scott, and it should be denied as to the claims against Defendants Walker, Wilkes, and

Evans. Therefore, the case should proceed to trial only on Plaintiff's ETS claims against Defendants Walker, Wilkes, and Evans.

SO REPORTED and RECOMMENDED this 6th day of February, 2012, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE