DAVID DWAYNE CASSADY,　　　　　*
　　　　　　　　　　　　　　　　*
　　　　Plaintiff,　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　　v.　　　　　　　　　*　　　　CV 109-128
　　　　　　　　　　　　　　　　*
VICTOR L. WALKER, Warden; SCOTT　*
WILKES, Deputy Warden; and　　　*
VERNEAL S. EVANS, Captain,　　　*
　　　　　　　　　　　　　　　　*
　　　　Defendants.　　　　　　　*

## O R D E R

Presently pending before the Court is Defendants Victor L. Walker, Scott Wilkes, and Verneal S. Evans's ("Defendants") second motion for summary judgment. (Doc. no. 109.) For the reasons set forth below, Defendants' motion is **DENIED**.

## I. BACKGROUND

This case, brought pursuant to 42 U.S.C. § 1983, arises out of Plaintiff David Dwayne Cassady's ("Plaintiff") incarceration at Augusta State Medical Prison ("ASMP") in Grovetown, Georgia. Considering the unconventional course charted by this litigation, a discussion of the procedural background is warranted.

### A. Procedural Background

Plaintiff, at the time acting pro se, initiated this suit on October 16, 2009. (Doc. no. 1.) On April 1, 2010, Plaintiff,

having obtained counsel, amended his amended complaint, raising the following claims: first, he alleged that Defendants acted with deliberate indifference to his present and future health needs in exposing him to unjustifiable levels of environmental tobacco smoke ("ETS") at ASMP, in violation of the Fourteenth Amendment; second, he alleged that Steven Scott and Edmond Garnett acted with deliberate indifference to his present and future health needs in interfering with his medical treatments, in violation of the Fourteenth Amendment.[1] (Doc. no. 13 ¶¶ 40-41.)

On Defendants' first motion for summary judgment, the United States Magistrate Judge issued a report and recommendation that the motion be granted in part and denied in part. (Doc. no. 46, at 28.) Specifically, the Magistrate Judge recommended that Defendants' motion be granted as to Plaintiff's medical treatment claim against Mr. Scott and Mr. Garnett. The Magistrate Judge further recommended that Defendants' motion be denied as to Plaintiff's ETS claims and that the "case should proceed to trial only on Plaintiff's ETS claims against Defendants Walker, Wilkes, and Evans." (Id. at 29.)

---

[1] 42 U.S.C. § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred . . . ." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). An incarcerated plaintiff may use § 1983 as a vehicle to challenge the deprivation of his Eighth Amendment right to be free of cruel and unusual punishment, which was made applicable to the States by the Fourteenth Amendment. See Estelle v. Gamble, 429 U.S. 97, 101-02 (1976) (citing Robinson v. California, 370 U.S. 660 (1962)).

After conducting a careful, de novo review of the file, this Court adopted the Magistrate Judge's report and recommendation as its own opinion. Consequently, Mr. Scott and Mr. Garnett were dismissed from the case, and the Court held that the case would proceed to trial "only on Plaintiff's Eighth Amendment claims against Defendants Walker, Wilkes, and Evans for acting with deliberate indifference in exposing him to levels of [ETS] that posed an unreasonable risk of serious damage to his future health." (Doc. no. 49 (emphasis added).) The parties proceeded on Plaintiff's future-health claim at trial held on October 1, 2012. (See doc. nos. 88, 101.) At the conclusion of Plaintiff's case-in-chief, the Court granted Defendants' motion for a judgment as a matter of law, concluding that Plaintiff had failed to present evidence establishing a causal link between his harm and Defendants' actions. (Doc. nos. 95; 101, at 84-87.) Judgment was entered in Defendants' favor on October 2, 2012. (Doc. no. 95.)

Plaintiff timely filed a notice of appeal on October 23, 2012. (Doc. no. 96.) In a per curiam opinion, the Eleventh Circuit Court of Appeals affirmed this Court's grant of Defendants' motion for judgment as a matter of law on Plaintiff's future-health claim. (Doc. no. 103, at 7-8.) However, it noted a discrepancy between the Magistrate Judge's report and recommendation and the Court's adoption Order. (Id. at 4-5.) The Magistrate Judge's report and recommendation never specifically recommended that summary judgment

3

was appropriate for Plaintiff's present-health claims.  The Court of Appeals noted that limiting the trial proceedings to solely the future-health claim operated as a rejection of the Magistrate's Judge recommendation to deny Defendant's motion in its entirety and "effectively grant[ed] summary judgment in favor of the Defendants on [Plaintiff's] present-health claim . . . ."  (Id. at 6.)  In addition, the Court of Appeals explained that this Court failed to "sufficiently explain its rulings" and provide the Court of Appeals the "opportunity to conduct meaningful appellate review" on the present health claim.  (Id. at 5-6 (internal quotation marks omitted) (quoting Danley v. Allen, 480 F.3d 1090, 1091-92 (11th Cir. 2007)).)  Consequently, the Court of Appeals vacated the Court's adoption order in part and remanded the matter "to enter a reasoned order addressing whether the Defendants are entitled to summary judgment on the present-health claim."  (Id.)

By Order dated June 12, 2013, the Court reopened the case and directed the parties to re-brief only the portions of their filings relevant to the present-health claim.  (Doc. no. 104.)  The parties have complied with the Court's Order, and Defendants moved for summary judgment on July 2, 2013.[2]  (Doc. no. 109.)  The time for

---

[2] The Clerk has issued to Plaintiff notice of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. no. 110.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

4

filing materials in opposition has expired, and the motion is ripe for consideration.

## B. Factual Background

The relevant facts, construed in Plaintiff's favor as the nonmoving party, are as follows.

Plaintiff, an inmate in the Georgia Department of Corrections ("GDOC") system, was incarcerated at ASMP from February 17, 2009, until his transfer to a different prison facility on May 11, 2010. (Walker Aff. ¶ 5 & Ex. A.) Defendant Walker was the Warden of ASMP at the time Plaintiff arrived, and he served in that position until October 1, 2009. (Id. ¶ 4.) During the relevant time period, Defendant Wilkes was the Deputy Warden of Care and Treatment, and Defendant Evans was the Captain of Security. (Wilkes Aff. ¶ 3; Evans Aff. ¶ 3.) Defendant Wilkes's responsibilities include participating in prison management and operations, directing prison security, and overseeing care and treatment services. (Wilkes Aff. ¶ 4.) In addition, as chairman of the classification committee, Defendant Wilkes reviews inmate profiles and assigns inmates to dormitories and job details. (Id. ¶ 5.) Defendant Evans's responsibilities include coordinating and administering security operations at ASMP, ensuring compliance with security policies and procedures, and overseeing prison safety and sanitation. (Evans Aff. ¶ 4.)

1.  Plaintiff's ETS Exposure at ASMP and Respiratory Conditions

When he arrived at ASMP, Plaintiff was initially housed in the level three mental health unit with a non-smoking cell mate for about a week. (Doc. no. 1, at 13;[3] Cassady Dep. at 64;[4] Walker Aff. ¶ 7 & Ex. A.) He was then assigned a different cell mate, Justin Nichols ("Nichols"), a heavy smoker. (Cassady Dep. at 64-65.) Plaintiff and Nichols shared the cell for approximately three months. (Id.) During that time, Nichols smoked approximately 30 cigarettes per day, primarily in their shared cell. (Doc. no. 1-3, at 12.) After Nichols, Plaintiff's third cell mate was a non-smoker who was moved out after a single weekend. (Cassady Dep. at 64.) Next, David Wayne Little ("Little") was assigned to Plaintiff's cell and shared Plaintiff's cell for approximately one month. (Id.; doc. no. 1-3, at 13.) During that time, Little smoked on average 60 cigarettes per day. (Doc. no. 1-3, at 13.) Due to the lack of smoke breaks, Little primarily smoked in the cell. (Id.)

---

[3] This Court may consider Plaintiff's sworn complaint and its accompanying exhibits in ruling on Defendants' motion for summary judgment. (See doc. nos. 46, at 3 n.3; 49.)

[4] Defendants filed Plaintiff's deposition taken in Cassady v. Owens, No. 4:08-CV-250 (S.D. Ga. Nov. 3, 2010) (hereinafter "CV 408-250"), which arises out of Plaintiff's exposure to ETS at Coastal State Prison. (See id., doc. no. 1.) Defendants relied on this deposition in support of their first motion for summary judgment. (Doc. no. 33.) The Court will therefore consider such testimony to the extent that it relates to the issues in this case.

6

Ninety-two percent of the inmates in the level three mental health unit smoked indoors. (Doc. no. 1, at 13.) Moreover, the unit's one exhaust fan remained in the off position for the majority of the day, and ETS often accumulated in the Plaintiff's unit. (Id.) The accumulated ETS often was so thick that it triggered the unit's fire alarm. (Id. at 14.)

In June of 2009, Plaintiff was transferred out of the level three mental health unit into a single-man cell in segregated confinement. (Wilkes Aff. ¶ 15; Walker Aff., Ex. A.) While Plaintiff did not have a cell mate in the segregation unit, he was nevertheless exposed to significant levels of ETS and suffered severe respiratory attacks that required medical treatment. (Doc. no. 1, at 36-37.)

On or about June 24, 2009, Plaintiff attempted suicide by soaking a rag with liquid Albuterol and forcing it into his mouth. (Doc. no. 1, at 38-39; Dr. Nichols Aff. ¶ 33.[5]) As a result, he was admitted to ASMP's "Crisis Stabilization Unit" and was later transferred to the "Acute Care Unit" on July 1, 2009. (Dr. Nichols Aff. ¶ 33; Wilkes Aff. ¶¶ 21-22; Walker Aff., Ex. A.) On or about July 7, 2009, Plaintiff was transferred to the level four mental health unit, where he remained until his transfer to another prison facility on May 11, 2010. (Wilkes Aff. ¶ 17; Walker Aff., Ex. A.)

---

[5] Dr. Nichols serves as the Medical Director at ASMP and is licensed to practice medicine in the State of Georgia. (Dr. Nichols Aff. ¶ 3.)

While in the level four mental health unit, Plaintiff was confined in a single-man cell with windows that he could open from the inside. (Wilkes Aff. ¶ 17.) However, Plaintiff was nevertheless subjected to high levels of ETS in the unit. (Doc. nos. 34-19 to 34-25, at 39-41.)[6] In addition, prison officials observed that the inmates housed in the level four mental health unit suffered from severe disorders and were especially non-compliant with ASMP policies, including those prohibiting smoking indoors. (See id. at 86, 94.)

Plaintiff is a non-smoker and has no history of smoking in his immediate family. (Cassady Dep. at 10-11, 53.) Prior to his transfer to ASMP, Plaintiff had been diagnosed with Reactive Airway Disease ("RAD") and asthma.[7] (Dr. Nichols Aff., Ex. B, at Bates 421, 423, 436, 440, 480.) Upon intake at ASMP, Plaintiff was prescribed Q-var, an albuterol inhaler, and a nebulizer to treat

---

[6] This evidence comes from Plaintiff's testimony in CV 408-250 at a show cause hearing held on October 21, 2010, before the Honorable G.R. Smith, United States Magistrate Judge. (Cassady, Case No. 4:08-CV-250, doc. no. 105.) Defendants submitted the transcript in support of their first motion for summary judgment. The Court will therefore consider such testimony to the extent that it relates to the issues in this case.

The impetus for the show cause hearing was the Commissioner of the GDOC's alleged noncompliance with a preliminary injunction issued by the Honorable William T. Moore, Jr., United States District Judge. (See id., doc. nos. 27, 37, 40.) The preliminary injunction required the defendant to provide Plaintiff with smoke-free accommodations. (Id., doc. nos. 37, 40.) Further, the injunction explicitly applied to Plaintiff's confinement at ASMP. (See id.) The Magistrate Judge determined that Plaintiff's confinement at ASMP failed to comply with the preliminary injunction. (See id., doc. nos. 106, 113.)

[7] The parties alternate between the terms "Reactive Airway Disease" and "Reactive Airway Dysfunction Syndrome" when referring to Plaintiff's condition. For ease of reference, the Court will refer to Plaintiff's condition as RAD.

his asthma. (Id. & Ex. B, at Bates 435-36.) In mid-March of 2009, medical tests revealed that Plaintiff had developed mild Chronic Obstructive Pulmonary Disease ("COPD") and "severe diffusion defect." (Id. ¶ 25 & Ex. B, at Bates 416-17; doc. no. 1-3, at 63.) On March 24, 2009, Plaintiff was evaluated by a pulmonologist, Dr. Amy Blanchard, who concluded that Plaintiff had moderate-to-severe persistent asthma, allergic rhinosinusitis, and "probable" obstructive sleep apnea. (Dr. Nichols Aff. ¶ 27 & Ex. B., at Bates 413.) In her findings and recommendations, Dr. Blanchard noted that Plaintiff's symptoms were exacerbated by smoke and that she found blood in Plaintiff's sputum. (Id.) Dr. Blanchard instructed Plaintiff to "avoid smoke, chemicals." (Id. & Ex. B, at Bates 11.) Further tests performed on April 22, 2009, indicated that Plaintiff had developed moderate-to-severe COPD and hyperinflation.[8] (Id. ¶ 29 & Ex. B, at Bates 393-94.) A CT scan performed on June 23, 2009, revealed "multiple pulmonary nodules" in Plaintiff's lungs.[9] (Id. ¶ 39 & Ex. B, Bates 104, 278, 400.) In addition, Plaintiff's nebulizer treatments increased from twice a day, as needed, to four times a day, mandatory. (Cassady Decl. ¶ 21.)

---

[8] During his incarceration as ASMP, Plaintiff also suffered from bipolar disorder, obsessive compulsive disorder, post-traumatic stress disorder, gender identity disorder, nocturnal enuresis, obesity class 1, and hypertension. (Dr. Nichols Aff. ¶¶ 10, 23 & Ex. B, at Bates 267, 433, 436.)

[9] A follow-up CT scan performed on September 22, 2009, revealed that all but one of the nodules had resolved themselves. (Dr. Nichols Aff. ¶ 40 & Ex. B, at Bates 104, 278.)

During his confinement at ASMP, Plaintiff wrote numerous letters and grievances to Defendants, informing them of his various respiratory conditions and complained that he was being subjected to high levels of ETS in his living quarters despite the prison's policy against indoor smoking. (See doc. nos. 1-3 to 1-5.) He also indicated that his ETS exposure was negatively affecting his health and requested that he be provided with ETS-free housing. (Id.) In letters to Defendants Wilkes and Evans dated April 5 and April 9, 2009, Plaintiff explicitly noted Dr. Blanchard's instruction that he not be exposed to smoke.[10] (Doc. no. 1-4, at 11, 17, 19.)

In response to his letters and grievances, Plaintiff was repeatedly informed that the prison's policy prohibiting indoor smoking adequately addressed his concerns. (See doc. nos. 1-4 to 1-5.) By a memorandum dated April 8, 2009, Defendant Wilkes rejected Plaintiff's complaints, stating that he was not eligible to move to another dorm. (Doc. no. 1-4, at 10.) Defendant Wilkes further wrote, "Even if you could, doing so would not change your situation." (Id.) Defendant Wilkes had conferred with other prison officials about Plaintiff's housing assignment following the preliminary injunction granted in CV 408-250 requiring that Plaintiff be provided smoke-free accommodations; Defendant Wilkes

---

[10] On April 7, 2009, prison officials issued him a "medical profile" that stated, "detail restriction: no chemicals, fumes or dust." (Wilkes Aff. ¶ 36 & Ex. O.)

10

and the other prison officials decided to keep Plaintiff confined in the same unit despite knowing that the inmates in that unit were particularly non-compliant with the smoking policy. (Doc. nos. 34-19 to 34-25, at 94-95.)

### 2. ASMP's Smoking Policy

The GDOC Standard Operating Procedure effective during Plaintiff's incarceration at ASMP provided that "the use of tobacco products by inmates shall be prohibited inside any building, office or state vehicle" and allowed inmates to smoke only in designated areas outside of the correctional facility's buildings. (Walker Aff. ¶ 8 & Ex. B; Wilkes Aff. ¶ 7 & Ex. A.) During Plaintiff's fifteen-month incarceration at ASMP, ASMP officials issued 294 disciplinary reports for smoking policy violations. (Henry Aff. ¶ 6 & Ex. A.) ASMP officials also used verbal warnings or additional work assignments as alternative methods to enforcing the smoking policy. (Wilkes Aff. ¶ 10.)

Despite the smoking policy, prison officials rarely enforced the policy, if at all. Although prison officials allowed inmates some smoking breaks, they "didn't start giving smoke breaks at ASMP until [Plaintiff] filed [for] the [preliminary] injunction [in CV 408-250]." (Cassady Dep. at 52.) Even when the prison officials did allow smoke breaks, they were very infrequent, resulting in more inmates smoking indoors. (Doc. no 1-3, at 12-29.) Neither Defendant Walker nor the deputy wardens, including Defendant

11

Wilkes, performed daily inspections. (Cassady Decl. ¶¶ 3-4, 12.)
Further, when Plaintiff reported violations of ASMP's smoking
policy to Defendants, he never observed Defendants taking any
action to enforce the smoking policy. (Id. ¶¶ 5, 10, 11, 13, 20.)
Prison inmates were undeterred from smoking in the dorm and did so
with relative impunity: sometimes prison officials issued
disciplinary reports, but often they merely told the prison inmates
to put out their cigarettes without taking any additional
enforcement measures. (See doc. no. 1-3, at 12-29.) For example,
an inmate averred that prison officials have caught him smoking
indoors and told him to put out his cigarette. (Doc. nos. 34-19 to
34-25, at 7-8, 11-12, 15-16.) Nevertheless, the officials walked
away without actually making him put out the cigarette, and the
inmate continued smoking. (Id.) Another inmate averred that the
prison officials sometimes violated the policy themselves by
smoking indoors. (Doc. no. 1-3, at 26.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no
genuine issue as to any material fact and . . . the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).
Facts are "material" if they could affect the outcome of the suit
under the governing substantive law. Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in

12

the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606–08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere

13

conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

### III. DISCUSSION

**A. Plaintiff's Present Health Claim**

The Eighth Amendment does not require comfortable prisons. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Neither, however, does it permit inhumane ones. Id. The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" and prohibits punishments that are "incompatible with the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (internal quotation marks and citations omitted). Accordingly, the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, medical care, and safety to inmates. Farmer, 511 U.S. at 832. However, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003) (alteration in original) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). "[O]nly the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (alteration in original) (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1997)).

Where, as here, a plaintiff has alleged that exposure to ETS has violated his constitutional rights, courts inquire as to whether a prison official has been deliberately indifferent to a prisoner's existing serious medical needs, see Estelle, 429 U.S. at 104; Brown v. Smith, 187 F. App'x 947, 949-50 (11th Cir. 2006), and whether a prison official has been deliberately indifferent to conditions posing a substantial risk of future harm. See Helling v. McKinney, 509 U.S. 25, 35 (1993); Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005). Plaintiff's future health claim has already been adjudicated in Defendants' favor at trial and affirmed on appeal. (See doc. nos. 95, 103.) At issue is whether a reasonable jury could conclude that Defendants were deliberately indifferent to Plaintiff's existing serious medical needs while he was incarcerated at ASMP.

To sustain an Eighth Amendment claim pursuant to 42 U.S.C. § 1983, Plaintiff must satisfy three elements. First, he must satisfy an objective component, that he had a serious medical need while he was incarcerated at ASMP. See Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) (citation omitted).[11] Second, Plaintiff must satisfy a subjective component, that Defendants

---

[11] The plaintiff in Goebert was a pretrial detainee, and the court noted that the Due Process Clause of the Fourteenth Amendment technically governed her claim. See Goebert, 510 F.3d at 1326. However, the court analyzed her claim under the Eighth Amendment, observing that "the standards under the Fourteenth Amendment are identical to those under the Eighth." Id. (citing Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005)).

"acted with deliberate indifference to [his] serious medical need."
Id. Third, "as with any tort claim, [he] must show that the injury
was caused by [Defendants'] wrongful conduct." Id. (citing Hale v.
Tallapoosa Cnty., 50 F.3d 1579, 1582 (11th Cir. 1995)). The Court
will consider each element in turn.

### 1. Objective Component

A serious medical need is "one that has been diagnosed by a
physician as mandating treatment . . . ." Kuhne v. Florida Dep't
of Corrections, No. 12-13387, 2014 WL 503146, at *4 (11th Cir. 2014
(quoting Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir.
2009)). Alternatively, a serious medical need is "one that is so
obvious that even a layperson would easily recognize the necessity
for a doctor's attention." Id. at *4 (quoting Mann, 588 F.3d at
1307).

Here, the relevant medical evidence shows that Plaintiff is
particularly susceptible to ETS exposure. He suffers from
respiratory conditions that became progressively more severe during
his confinement at ASMP, including RAD, moderate-to-severe asthma,
moderate-to-severe COPD, and allergic rhinosinusitis.[12] Similarly,
the frequency of Plaintiff's treatments for these respiratory
conditions has increased. Plaintiff also suffered from respiratory

---

[12] In CV 408-250, the United States District Judge and the Eleventh
Circuit found that Plaintiff's asthma and RAD rendered him especially
susceptible to ETS exposure. (See Cassady, Case No. 4:08-250, doc. no. 112,
at 9; Cassady v. Donald, 447 F. App'x 28, 31 (11th Cir. 2011).) Notably,
these findings predate Plaintiff's later, more serious diagnoses, including
his moderate-to-severe COPD.

episodes that required medical treatment. Dr. Blanchard noted in her findings and recommendations that Plaintiff's symptoms were exacerbated by smoke and that she found blood in Plaintiff's sputum. She instructed Plaintiff to avoid smoke. Moreover, Plaintiff presented evidence that he was exposed to significant levels of ETS in each of the units where he was housed at ASMP. Plaintiff's ETS exposure was particularly high in the level three mental health unit, where 92 percent of the inmates smoked, often indoors, and where Plaintiff spent several months sharing a cell with inmates who smoked between 30 and 60 cigarettes per day. Compare Nasseri v. City of Athens, 373 F. App'x 15, 18-20 (11th Cir. 2010) (concluding that the plaintiff created a genuine issue of fact that he had a serious medical need where plaintiff "had watering eyes, was coughing, had difficulty breathing, and was spitting blood" and claimed that he had developed RAD from his hour-long exposure to pepper spray in a poorly ventilated car), with Morefield v. Brewton, 442 F. App'x 425, 427 (11th Cir. 2011) (concluding that the plaintiff failed to show that he had a serious medical need where the prison effectively enforced its no-smoking policy and where the plaintiff spent only two months in the allegedly high-ETS environment; did not allege that he shared a cell with a smoker; and provided conclusory assertions that ventilation was poor and that ETS exposure worsened his conditions

18

and caused coughing, sleep deprivation, water eyes, and breathing problems).

Accordingly, a reasonable jury could conclude that Plaintiff's respiratory conditions and exposure in the high-ETS environment at ASMP constituted objectively serious medical needs.

## 2. Subjective Component

As for the subjective element, Plaintiff must show that Defendants acted "with deliberate indifference" to his serious medical needs. Goebert, 510 F.3d at 1326. Deliberate indifference requires proof of three elements: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than [gross] negligence." Id. at 1327 (alteration in original). Stated differently, the evidence must show that Defendants were aware of the infirm condition and "knowingly or recklessly declined to take actions that would have improved the condition[]." Thomas v. Bryant, 614 F.3d 1288, 1312 (11th Cir. 2010) (citing LaMarca v. Turner, 995 F.3d 1526, 1535 (11th Cir. 1993)).

Plaintiff has shown a sufficient quantum of evidence that Defendants were deliberately indifferent to his plight to overcome their motion. As already noted, Plaintiff's medical records methodically detailed his respiratory conditions. Further, Plaintiff repeatedly notified Defendants of these matters and of the high levels of ETS at ASMP in a series of letters and

grievances. In those communications, Plaintiff pleaded for a transfer to an ETS-free environment and noted Dr. Blanchard's report detailing his respiratory conditions and instructing that he avoid smoke. Moreover, the District Judge in CV 408-250 issued a preliminary injunction requiring that Plaintiff be provided a smoke-free environment that explicitly applied to the prison officials at ASMP. This evidence permits the reasonable inference that even though Defendants were aware of Plaintiff's medical needs, their obligations under the preliminary injunction, and Dr. Blanchard's instructions that Plaintiff not be exposed to smoke, they consciously chose not to even attempt to improve Plaintiff's circumstances or comply with the preliminary injunction.[13]

Moreover, there is a genuine issue that Defendants failed to enforce the GDOC policy prohibiting smoking inside correctional facility buildings. The adoption of a smoking policy is relevant to determining whether prison officials were deliberately indifferent to ETS. See Kelley, 400 F.3d at 1284 (citing Helling, 509 U.S. at 36). However, the mere existence of a formal smoking policy will not act as a shield where prison officials consciously fail to enforce it. See Talal v. White, 403 F.3d 423, 428 (6th

---

[13] Curiously, Defendants argue that they were not deliberately indifferent in treating Plaintiff's asthma, stating that "the record is void of any evidence of [Plaintiff] complaining about the medical treatment that he received for his asthma." (Defs.' Br. in Supp. Mot. Summ. J., at 10.) However, the treatment of Plaintiff's asthma attacks is not at issue here. Plaintiff's claim focuses on Defendants' knowledge of his severe respiratory conditions and their failure to reduce his exposure to ETS.

Cir. 2005) ("[T]he mere existence of non-smoking pods does not insulate a penal institution from Eighth Amendment liability . . . ."); Bartlett v. Pearson, 406 F. Supp. 2d 626, 632 (E.D. Va. 2005) ("[T]he mere existence of [a smoking] policy will not, by itself, satisfy the requirements of the Eighth Amendment; there must be a good faith effort to enforce the policy and the absence of such an effort may result in a finding of deliberate indifference.").

Contrary to Defendants' contentions that they enforced the smoking policy in good faith, Plaintiff has submitted evidence that smoke breaks were rarely provided and that inmates, including his own cell mates, continually smoked indoors unpunished. For example, an inmate averred that he continued smoking undeterred indoors because the prison officials would tell him to put out his cigarette and go about their business without ensuring that he did as instructed. Another inmate avers that prison officials at ASMP smoked indoors. Plaintiff's evidence also shows that Defendants failed to conduct daily inspections and that prison officials failed to take action when Plaintiff reported an incident of indoor smoking.

In addition, Defendants' own evidence undermines their contention that they enforced the smoking policy in good faith. Defendants highlight that they issued 294 disciplinary reports for smoking violations during the almost fifteen months Plaintiff was confined at ASMP and that they frequently used informal tactics to

21

punish violators. However, these facts, when considered with evidence of Defendants' lax enforcement of the smoking policy, suggests that the 294 disciplinary reports represent only a small fraction of the smoking violations that occurred at ASMP.

Moreover, Defendant Wilkes observed at the show cause hearing that inmates in the level four mental health unit were particularly prone to violating the smoking policy. Nevertheless, despite admitting his knowledge of these seemingly ubiquitous rule infractions, Defendant Wilkes testified that he and the other prison officials charged with Plaintiff's care chose to keep him housed him in the level four mental health unit. Accordingly, construing the evidence in Plaintiff's favor, this does not appear to be a situation where Defendants "imperfectly enforced" or even exhibited gross negligence in enforcing the smoking policy. (Defs.' Br. in Supp. Mot. Summ. J., at 15.) Rather, the evidence suggests that Defendants' knowingly failed to enforce it.

Equally unpersuasive is Defendants' contention that they were not deliberately indifferent to Plaintiff's exposure to ETS because he "was never given a profile for a smoke-free housing at ASMP[.]" (Id. at 12.) However, the existence of an ETS-related medical profile is, at most, simply one vehicle that may show Defendants' awareness of Plaintiff's health needs and exposure to ETS. Plaintiff has shown that he notified Defendants in writing of his medical conditions and the attendant risks of ETS exposure,

22

including Dr. Blanchard's explicit instructions to avoid smoke. It is also apparent that these Defendants were aware of the preliminary injunction in CV 408-250, which put them on further notice that Plaintiff should not be exposed to ETS. In light of these facts, it is immaterial whether Plaintiff had an ETS-related medical profile.

Based upon the foregoing, the Court concludes there is a genuine issue of fact that Defendants were deliberately indifferent to Plaintiff's health needs and exposure to ETS.

### 3. Causation

Defendants also argue that they are entitled to summary judgment because Plaintiff fails to present sufficient proof of causation. This Circuit has explained that a plaintiff seeking to raise an Eighth Amendment claim bears the burden to establish "two causal links." Hale, 50 F.3d at 1584. Here, Plaintiff must establish a link between Defendants' alleged deliberately indifferent acts and omissions with the unconstitutional condition at ASMP. Id. (citing LaMarca, 995 F.2d at 1538); see Goebert, 510 F.3d at 1327 ("The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." (citation omitted)); Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982) ("[§ 1983] plainly requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional

deprivation." (citation omitted)). Second, Plaintiff must establish a link between the unconstitutional condition and his injury. Id. (citing LaMarca, 995 F.2d at 1538); see Thomas, 614 F.3d 1317 n.29 ("[T]o prevail on an Eighth Amendment claim brought pursuant to § 1983, a plaintiff must also show a causal connection between the constitutional violation and his injuries.") (citing Marsh v. Butler Cnty., 268 F.3d 1014, 1028 (11th Cir. 2001), abrogated on other grounds by Bell Atl. Corp v. Twombly, 550 U.S. 544 (2007)). The relationship between these two causal links has been described by the Eleventh Circuit in LaMarca:

> If a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is "precluded from contending that the unconstitutional condition was not at least a proximate cause of . . . injuries" that arose from that condition. This is not to say that a plaintiff need not show a causal link between the constitutionally infirm condition and the alleged injuries. Rather, the finding that a prison condition offends the Eighth Amendment presupposes the distinct likelihood that the harm threatened will result. The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries . . . .

LaMarca, 995 F.2d at 1538-39 (quoting Williams, 689 F.2d at 1389).

Here, a reasonable jury could conclude that Plaintiff has satisfied both causal links. Regarding his burden under the first link, Plaintiff has presented sufficient evidence of causation in two respects. First, a reasonable jury could conclude that Defendants' failure to enforce the GDOC smoking policy exposed

24

Plaintiff to high levels of ETS. Defendants were all responsible for ensuring compliance with prison policies and procedures. In addition, there is evidence that Defendants rarely enforced this policy—even when they found inmates smoking indoors—and limited smoking breaks outside. Moreover, a reasonable jury could infer that indoor smoking was widespread and significantly greater than the number of disciplinary reports indicates due to the lax enforcement of the policy and the high percentage of inmates that smoked. Considering this evidence, a reasonable jury could find that Defendants' failure to act caused the constitutionally infirm condition in exposing Plaintiff to high levels of ETS.

Second, a reasonable jury could conclude that Defendants perpetuated Plaintiff's exposure to the constitutionally infirm condition in failing to move Plaintiff to an ETS-free environment. The evidence suggests that Defendants possessed the authority to change Plaintiff's housing assignment. In addition, Defendants received and considered Plaintiff's letters complaining of ETS and requesting a new housing assignment. Plaintiff specifically noted in his letters Dr. Blanchard's instructions that he not be exposed to smoke. Further, Defendant Wilkes discussed ASMP's obligations regarding Plaintiff's cell assignment under the preliminary injunction imposed in CV 408-250. Nevertheless, Defendants chose to keep Plaintiff in the level four mental health unit, despite

their knowledge that the inmates therein were particularly apt to violate the smoking policy.

Defendants' argument that Plaintiff, despite his complaints about indoor smoking, purchased cigarettes and contributed to his own ETS exposure is unavailing. Plaintiff testified that he "never consumed any tobacco products." (Cassady Dep. at 53.) Plaintiff explained that he would give tobacco products to other inmates in exchange for their protection, which he felt was necessary in light of a past incident in which he was stabbed and raped by another inmate. (Id. at 54-55, 66-68; doc. no. 34-19, at 8-13.) Plaintiff further explained that prison officials limit the number of stamps and legal supplies that a single inmate can purchase at the prison's store; as a result, prior to obtaining counsel, he would often trade tobacco products for such materials. (Cassady Dep. at 55-56.) Also, Plaintiff stated that he occasionally purchased tobacco products out of pity for inmates who did not have any resources. (Id. at 56.)

Plaintiff has also satisfied his burden regarding the second causal link, that subjecting him to ETS caused him injury. Defendants argue that "there is nothing in the record to show that any action or inaction by the Defendants caused any alleged injury" and that Plaintiff's "own, conclusory allegations that his condition worsened because of ETS exposure or that ETS caused him to suffer from respiratory problems is (sic) insufficient to

26

establish causation . . . ." (Defs.' Br. in Supp. Mot. Summ. J., at 16-17.) These arguments are meritless and are contradicted by the record evidence.

Plaintiff's medical records show that he is particularly susceptible to ETS and that his respiratory conditions grew progressively more severe during his time at ASMP. In addition, Dr. Blanchard observed that Plaintiff's conditions were exacerbated by smoke and found blood in Plaintiff's sputum. Further, even though Plaintiff was given medication to treat his asthma, his condition worsened. Plaintiff's COPD was subsequently downgraded from mild to moderate-to-severe, his asthma was downgraded to moderate-to-severe, and tests revealed that he had developed hyperinflation and pulmonary nodules on his lungs. Moreover, Plaintiff's evidence shows that the breathing treatments for his respiratory conditions increased. Based upon the foregoing, a reasonable jury could conclude that Plaintiff's exposure to ETS at ASMP caused him injury. See Nasseri, 373 F. App'x at 18-20 (concluding the evidence permitted the reasonable inference that the plaintiff's prolonged exposure to pepper spray and the lack of medical treatment caused his claimed development of RADS).

In short, there are genuine disputes of material fact that Defendants were aware of Plaintiff's serious medical needs, that Defendants were deliberately indifferent to those needs, and that

Defendants' failure to act caused Plaintiff's constitutional harm and caused him injury.

## B. Qualified Immunity

The Court rejects the assertion that Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Townsend v. Jefferson Cnty., 601 F.3d 1152, 1157 (11th Cir. 2010) (quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)). The defendant must show that he was acting within his discretionary authority; if he does, then "the plaintiff must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Townsend, 601 F.3d at 1158 (punctuation omitted) (quoting Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)). "A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent, and if a constitutional rule applies with obvious clarity to give an official fair warning that violating that right is actionable." Bennett v. Hendrix, 423 F.3d 1247, 1255 (11th Cir. 2005) (citations and internal quotation marks omitted).

Here, there is no dispute that Defendants were acting within their discretionary authority. And, for the reasons previously discussed, Plaintiff has shown that Defendants have violated his Eighth Amendment rights.[14] Moreover, this right had been clearly established at the time of the violation. As observed by the Eleventh Circuit:

> Both the Supreme Court and this Court have held that a prisoner can state a cause of action under the Eighth Amendment for exposure to second-hand smoke by "alleging that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." Moreover, . . . the Supreme Court has "directly addressed" and "provided clear guidance" on Eighth Amendment claims based on exposure to second-hand smoke.

Cassady, 447 F. App'x at 31 (quoting Helling, 509 U.S. at 35; Kelley, 400 F.3d at 1284). Supreme Court precedent also recognizes that a "prison official can violate the Eighth Amendment . . . by being deliberately indifferent to a prisoner's existing serious medical needs." Cassady v. Wilkes, 519 F. App'x 677, 679 (11th Cir. 2013) (citing Estelle, 429 U.S. at 103-04). In light of the Eleventh Circuit and Supreme Court case law delineating the nature of the Eighth Amendment right at issue in Plaintiff's present health claim, the Court rejects Defendants' assertion that they did not violate clearly established law.

---

[14] Of course, the Court's finding that Plaintiff has shown a violation of a constitutional right for qualified immunity purposes is limited to the present summary judgment stage of these proceedings, in which the facts are viewed in the light most favorable to Plaintiff. This finding should not be construed as any ruling or commentary on whether Plaintiff will ultimately prevail on his claim.

29

## C. Prison Litigation Reform Act of 1995 ("PLRA")

Finally, Defendants contend that the PLRA precludes Plaintiff's ability to recover money damages in this case. The PLRA states in relevant part, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e). This physical injury "must be more than de minimis, but need not be significant." Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999), vacated by 197 F.3d 1059 (1999), reinstated in relevant part, 216 F.3d 970 (2000) (en banc).

When a plaintiff has "not produce[d] evidence that he has suffered anything more than minimal or temporary physical effects from his confinement[,]" he has not shown that his injury is more than de minimis. Hale v. Sec'y for Dep't of Corr., 345 F. App'x 489, 492 (11th Cir. 2009); see Harris, 190 F.3d at 1287 (concluding that a dry shave constituted a de minimis physical injury, even though the shaving "caused bleeding, inflammation, irritation, ingrowing of hairs, infection, purulence and pain"). Conversely, evidence showing that a plaintiff suffered "continuing severe physical pain and other symptoms that persisted for an extended period of time and required medical treatment" is sufficient to constitute more than a de minimis physical injury. Thompson v. Sec'y, Fla. Dep't of Corr., No. 13-11272, 2014 WL 115682, at *2

(11th Cir. Jan. 14, 2014). As described by the Middle District of Georgia,

> [a] physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which last even up to two or three weeks. People in regular and ordinary events and activities in their daily lives do not seek medical care for the injuries they receive unless it obviously appears to be of a serious nature, or persists after home remedy care . . . . Injuries treatable at home and with over-the-counter drugs, heating pads, rest, etc., do not fall within the parameters of 1997e(e).

Jordan v. Corr. Corp. of Am., No. 4:08-CV-05, 2008 WL 687329, at *2 (M.D. Ga. Mar. 11, 2008) (quoting Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997)).

Here, the evidence supports the reasonable inference that Plaintiff suffered more than a de minimis physical injury. As already described, the evidence shows that Plaintiff's conditions, particularly his COPD and asthma, worsened during his incarceration at ASMP. In addition, Plaintiff suffered respiratory attacks at ASMP that required medical attention. He underwent multiple tests and evaluations at ASMP for his worsening respiratory conditions. His daily treatments to manage his respiratory conditions also increased. Considering this evidence in the light most favorable to Plaintiff, this evidence does not support the conclusion that Plaintiff only suffered temporary effects from his exposure to ETS. See Quinlan v. Pers. Transp. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009) (finding that an asthmatic plaintiff shackled in a

transport van only alleged injuries amounting to nothing more than discomfort and consequently that he only alleged a de minimis physical injury, where he experienced temporary chest pain, headache, difficulty breathing, and periodic episodes of back pain); Powell v. Harrison, No. CV 208-114, 2010 WL 331922 (S.D. Ga. Jan. 28, 2010) (concluding that hypertension, without more, is insufficient to be more than a de minimis physical injury). Rather, the evidence supports the reasonable inference that Plaintiff's respiratory conditions were acute and progressively worsened during his time at ASMP. See Thompson, 2014 WL 115682, at *1-2 (finding that the plaintiff's symptoms—headaches, weakness, cold sweats, dizziness, weight loss, numbness in his arm, and high blood sugar that caused fainting—amounted to "continuing severe physical pain and other symptoms that persisted for an extended period of time and required medical treatment. Although perhaps not significant, the physical injury that Thompson alleged rose above the de minimis threshold."). A reasonable jury could further infer that Plaintiff will continue to experience significant symptoms from his COPD and other respiratory conditions and require regular treatments to only manage these conditions. Accordingly, because there is a genuine issue of fact that Plaintiff suffered more than a de minimis physical injury, Defendants' attempt to limit the damages of his claim under the PLRA fails.[15]

---

[15] Defendants also ask this Court to find that § 1997e(e) precludes

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (doc. no. 109) is **DENIED**. This case will proceed to trial.

**ORDER ENTERED** at Augusta, Georgia, this 31ˢᵀ day of March, 2014.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

nominal damages. The Court declines to do so. The availability of nominal damages to a prisoner plaintiff who fails to allege a physical injury remains an unresolved issue in the Eleventh Circuit. See Al-Amin v. Smith, 637 F.3d 1192, 1199 n. 10 (11th Cir. 2011); Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 131 S.Ct. 1651 (2011); Boxer X v. Harris, 437 F.3d 1107, 1111 n. 3 (11th Cir. 2006). In Hughes v. Lott, 350 F.3d 1157, 1162-63 (11th Cir. 2003), the Eleventh Circuit stated "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." Thus, nominal damages may be available for Plaintiff's claim under § 1997e(e), even if he fails to demonstrate sufficient physical injury.